Leticia B. LOYA, Appellant

v.

Miguel LOYA, Vitol, Inc., Michael Metz, and Antonio "Tony" Maarraoui, Appellees

NO. 01–15–00197–CV

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued November 29, 2016

James E. Pane, Beaumont, for Appellant.

Patrick W. Mizell, Houston, for Appellee.

Panel consists of Justices Jennings, Keyes, and Brown.

## OPINION

Terry Jennings, Justice

Appellant, Leticia B. Loya, challenges the trial court's orders granting the motions of appellees, Miguel Loya, Vitol, Inc. ("Vitol"), Michael Metz, and Antonio "Tony" Maarraoui, to dismiss, under contractual forum-selection clauses, her lawsuit against them for conspiracy, fraud, negligence, and breaches of fiduciary duty. In her sole issue, Leticia contends that the trial court erred in granting appellees' motions and dismissing her lawsuit.

We affirm the orders of the trial court.

## Background

In her second amended petition, Leticia alleged that prior to 2006, she and her husband, Miguel, were "major shareholders" in Vitol Holding II S.A. ("VHIISA"), which is based in Luxembourg and "one of the world's largest independent energy trading companies." Miguel was a member of its board of directors, and he was employed by Vitol, an affiliated entity in Houston, Texas. In 2006, Leticia and Miguel exchanged their VHIISA shares for shares in Tinsel Group, S.A. ("Tinsel"), a "newly created entity" affiliated with VHIISA and based in Luxembourg.[1]

In 2008, Leticia and Miguel began di-

1. VHIISA and Tinsel are not parties to this appeal.

vorce proceedings.[2] Leticia claimed a community property interest in the Tinsel shares, and Miguel filed a sworn inventory listing the value of the shares at $29,500,000. Leticia argued that Miguel's valuation was "false" because he failed to include the value of certain rights included in the Tinsel shares and disclose that he and the other appellees were "actually in negotiations for Vitol to acquire ... equity in [Shell Oil Company's] downstream business in approximately nineteen ... countries in Africa" for approximately "$1,000,000,000." Leticia asserted that this information would have "significantly and materially impacted the value of the shares" that she had agreed to sell to Miguel in the divorce; he "had a duty to disclose this information and refrain from acting on it, but did not do so," before she executed a June 13, 2010 mediated settlement agreement ("MSA") in the divorce; "about one month" after she signed the MSA," Shell announced that it was in "negotiations" with Vitol; and "the next year, Vitol increased its revenue, and Tinsel stock significantly increased in value."

Leticia brought claims for conspiracy, breach of fiduciary duty, fraud, and negligence in a stock transaction against Miguel, Vitol, and Tinsel directors, Michael Metz and Antonio Maarraoui. She alleged that they "conspired to aid and facilitate [Miguel's] scheme to defraud" her by "conceal[ing]" the "imminent acquisition of West African assets by Vitol." And they breached their fiduciary duties to her by failing to "apprise her of all material information necessary for her to make an informed decision regarding a sale [of shares] to an insider [Miguel]"; "imple-

ment appropriate safeguards to ensure stockholders, like [her] are not unfairly disadvantaged"; and "establish appropriate internal controls to protect non-insider shareholders." She argued that they owed her both formal and informal fiduciary duties because they had "dealt with each other" for such a long period of time that such duties were owed. They "intentionally plotted and carried out a plan to actually defraud [her] personally and the community estate." They "made material misrepresentations and omitted material facts regarding the valuation of Tinsel stock and the [appurtenant] rights to [her]," on which she relied to her detriment. And their conduct constituted "fraud in a stock transaction."[3] Leticia sought actual damages, punitive damages in the amount of $400,000,000, and attorney's fees.

Vitol, Metz, and Maaraoui collectively filed an amended "Motion to Dismiss Based on Mandatory Forum Selection Clauses." To their motion, they attached copies of the VHIISA and Tinsel shareholder's agreements. In their motion, they asserted that "[a]s a shareholder of VHIISA, [Miguel] signed the VHIISA shareholder's agreement, which contains a mandatory forum-selection clause," which states as follows:

> 10.11 Any dispute arising out of or [i]n connection with this Agreement or the breach, termination or invalidity thereof shall be submitted exclusively to the jurisdiction of the courts of Rotterdam, the Netherlands.

The agreement further provides that the parties intended for spouses to be bound as follows:

---

2. *See Leticia B. Loya v. Miguel A. Loya,* No. 2008–24514 (257th District Court of Harris Cty., Tex.).

3. Tex. Bus. & Com. Code Ann. § 27.01 (Vernon 2015).

10.6 .... All obligations of Shareholders with respect to any shares covered by this Agreement shall, as the context requires, bind Shareholder's spouse and the divorce or death of such spouse shall not vitiate the binding nature of such obligation.

In 2006, when Miguel exchanged his VHIISA shares for shares in Tinsel, he signed Tinsel's shareholder's agreement, which contains an identical clause and provision.

Vitol, Metz, and Maaraoui further asserted that Leticia's claims are "based on her alleged status as a VHIISA and Tinsel shareholder and arise from the Shareholder's Agreements." And, "to the extent [she] claims she is a shareholder or claims any rights to the shares registered in [Miguel's] name, she is bound by the forum-selection clauses" in the shareholder's agreements. The forum-selection clauses unambiguously vest exclusive jurisdiction in the courts of Rotterdam, the Netherlands, for "any dispute rising out of or in connection with the Shareholder's Agreements." And Leticia's claims "fall squarely within the scope of the mandatory forum-selection clauses."

Miguel also filed a "Motion to Dismiss Based on a Mandatory Forum Selection Clause." To his motion, he attached Tinsel's shareholder's agreement. In his motion, he asserted that on June 22, 2010, "over four years ago," the trial court entered a final decree of divorce on the MSA and Leticia did not appeal. And she now sues him "on property that was valued and divided in the decree," claiming that he had a duty to "independently disclose potential future operations of his employer" and "failed to tell her about the existence of a potential business transaction," which did not "c[o]me to fruition" until "approximately 14 months after the [decree] be-

came final." Miguel further asserted that a potential future business transaction had no bearing on the value of the community assets at the time they were divided. He argued that Leticia's claims against him should be dismissed based on the forum-selection clause in Tinsel's shareholder's agreement, which governs the shares about which Leticia sues.

In her collective response, Leticia argued that she is not bound by the forum-selection clauses in the agreements because she "never signed" them, her claims do not fall within their scope, and exceptions apply to their enforceability. In his reply, Miguel argued that Leticia is bound by the contractual forum-selection clauses because she "characterizes herself as a shareholder of VHIISA and Tinsel and asserts her rights based on that status." To his reply, Miguel attached copies of VHIISA's and Tinsel's shareholder's agreements.

After a hearing, the trial court granted appellees' motions to enforce the forum-selection clause and dismissed Leticia's claims against them.

## Standard of Review

■ We review a trial court's decision regarding the validity and enforcement of a forum-selection clause for an abuse of discretion. *In re AIU Ins. Co.*, 148 S.W.3d 109, 121 (Tex. 2004); *Deep Water Slender Wells, Ltd. v. Shell Int'l Expl. & Prod. Inc.*, 234 S.W.3d 679, 687 (Tex. App.–Houston [14th Dist.] 2007, pet. denied). A trial court abuses its discretion if it acts without reference to any guiding principles or acts arbitrarily or unreasonably. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). A trial court's failure to analyze or apply the law correct-

ly constitutes an abuse of discretion. *McDaniel v. Yarbrough*, 898 S.W.2d 251, 253 (Tex. 1995). An abuse of discretion does not occur if the trial court bases its decisions on conflicting evidence. *See Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997). And an abuse of discretion does not occur as long as some evidence of substantive and probative character supports the trial court's decision. *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex. App.–Houston [1st Dist.] 1993, writ denied). In the absence of findings of fact and conclusions of law, as here, we imply that the trial court found all facts necessary to support its decision so long as they are also supported by the evidence. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

■ Forum-selection clauses are generally enforceable and presumptively valid. *In re Laibe Corp.*, 307 S.W.3d 314, 316 (Tex. 2010). Enforcement of a forum-selection clause is required unless the party opposing enforcement "clearly shows" that (1) enforcement would be unreasonable and unjust; (2) the clause is invalid for such reasons as fraud or overreaching; (3) enforcement would contravene a strong public policy of the forum where the suit was brought; or (4) the selected forum would be seriously inconvenient for trial. *Id.*

■ In the determining the validity and enforceability of a forum-selection clause, a trial court first determines, by applying ordinary principles of contract interpretation, whether the contract at issue in fact contains a forum-selection clause and whether the claims fall within the scope of the clause. *Deep Water Slender Wells, Ltd.*, 234 S.W.3d at 687–88. The court bases its determination on the language of the clause and the nature of the claims purportedly subject to the clause. *Id.* at 688. If the claims fall within the scope, the court must determine whether to enforce the clause. *Id.*

■ We review a trial court's interpretation of a contractual forum-selection clause de novo. *Phx. Network Techs. (Europe) Ltd. v. Neon Sys., Inc.*, 177 S.W.3d 605, 610 (Tex. App.–Houston [1st Dist.] 2005, no pet.). In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). If a contract is worded so that it can be given certain or definite meaning, then it is unambiguous, and we construe it as a matter of law. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012). And we do so without considering parol evidence. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008). If, however, after applying the pertinent rules of construction, the contract is subject to two or more reasonable interpretations, then it is ambiguous and presents a fact issue regarding the parties' intent. *El Paso Field Servs., L.P.*, 389 S.W.3d at 806.

## Forum–Selection Clauses

■ In her sole issue, Leticia argues that the trial court erred in dismissing, based on the forum-selection clauses in the shareholder's agreements, her claims against appellees because she was "not a signatory" to the agreements and her claims "do not fall within the scope of the forum-selection clause[s]."

The record shows that Miguel, Metz, and Maarraoui each executed shareholder's agreements, which provide that "[a]ny

dispute arising out of or in connection with this [a]greement or the breach, termination or invalidity thereof shall be submitted exclusively to the jurisdiction of the courts of Rotterdam, the Netherlands." Thus, the shareholders' agreements unambiguously designate the courts of Rotterdam as the exclusive jurisdiction to resolve "[a]ny dispute arising out of or in connection with" the agreements. The agreements further provide that the parties intended for spouses to be bound as follows: "All obligations of Shareholders with respect to any shares covered by this [a]greement shall, as the context requires, bind Shareholder's spouse[,] and the divorce ... of such spouse shall not vitiate the binding nature of such obligation." It is undisputed that Leticia did not sign, and is not a named party to, the shareholder's agreements.

"Texas law has long recognized that nonparties may be bound to a contract under various legal principles." *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131 (Tex. 2005). The Texas Supreme Court has "found assent by nonsignatories to arbitration provisions when a party has obtained or is seeking substantial benefits under an agreement under the doctrine of direct benefits estoppel." *Rachal v. Reitz*, 403 S.W.3d 840, 845–46 (Tex. 2013). This Court has held that arbitration authority, and thus estoppel theory, applies by analogy to forum-selection clauses. *See Neon Sys., Inc.*, 177 S.W.3d at 623 (citing *In re AIU Ins. Co.*, 148 S.W.3d at 113 (holding arbitration agreement "another type of forum-selection clause" and "no meaningful distinction between this type of forum-selection clause and arbitration clauses")); *see also Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997) (applying law of arbitration clauses to forum-selection clauses); *Deep Water Slender Wells, Ltd.*,

234 S.W.3d at 688; *St. Clair v. Brooke Franchise Corp.*, No. 2–06–216–CV, 2007 WL 1095554, at *4 (Tex. App.–Fort Worth Apr. 12, 2007, no pet.) (mem. op.) ("Very little Texas case law exists discussing whether a forum selection clause in an agreement can and should be enforced against a nonsignatory. We agree with the First Court of Appeals that arbitration law on this matter applies by analogy because an arbitration agreement is a type of forum selection clause.").

Under direct-benefits estoppel, a "non-signatory who is seeking the benefits of a contract or seeking to enforce it 'is estopped from simultaneously attempting to avoid the contract's burdens.'" *Rachal*, 403 S.W.3d at 846 (citing *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005)). First, "a litigant who sues based on a contract subjects him or herself to the contract's terms." *Weekley Homes*, 180 S.W.3d at 131 (quoting *FirstMerit Bank, N.A.*, 52 S.W.3d 749 (Tex. 2001)). To sue "based on a contract" means to "seek, through the claim, to derive a direct benefit from the contract." *See id.* Whether a claim seeks a direct benefit from the contract "turns on the substance of the claim, not artful pleading." *Id.* at 131–32. For instance, "nonparties generally must arbitrate claims if liability arises from a contract with an arbitration clause, but not if liability arises from general obligations imposed by law." *In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 761 (Tex. 2006). Second, a nonparty may be subject to the terms of a contract, outside of litigation, if it "deliberately seeks and obtains substantial benefits from the contract itself." *Weekley Homes*, 180 S.W.3d at 132. This analysis focuses on the nonparty's conduct during the performance of the contract. *Id.* at 132–33.

In *Weekley Homes*, the plaintiff, residing in a home purchased by a family member, sued the defendant homebuilder claiming that she had developed asthma from dust created by its repairs to the home. *Id.* at 129. The defendant moved to compel arbitration based on an arbitration clause in the purchase contract. *Id.* The trial court refused to compel arbitration because the plaintiff did not sign the contract. *Id.* at 130. On appeal, the plaintiff argued that the clause did not apply to her because she "ma[d]e no claim" on the contract. *Id.* at 132. The supreme court noted, however, that the plaintiff had not merely resided in the home. *Id.* at 133. Rather, claiming authority under the purchase contract, she had directed how the defendant was to construct many features, repeatedly demanded repairs to "our home," and individually received financial reimbursement from the defendant. *Id.* The supreme court held that "having obtained these substantial actions from [the defendant] by demanding compliance with the provisions of the contract," the plaintiff "[could] not equitably object to the arbitration clause attached to them." *Id.* And "when a nonparty consistently and knowingly insists that others treat [her] as a party, [she] cannot later 'turn[ ] [her] back on the portions of the contract ... that [she] finds distasteful.' " *Id.* at 135 (quoting *E.I. Dupont de Nemours & Co. v. Rhone–Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 n.7 (3d Cir. 2001)). "A nonparty cannot both have [her] contract and defeat it too." *Id.*

Here, Leticia, throughout her pleadings, refers to herself as a "shareholder" and to the shares as owned by "[t]he Loyas." She asserts that appellees "owed [her] both formal and informal fiduciary duties ... [based on] the special relationships between the parties arising because the par-

ties dealt with each other in such a manner for a long period of time that such [duties were] owed." "She alleges that appellees breached their fiduciary duties to her by failing to "apprise her of all material information necessary for her to make an informed decision regarding a sale [of shares] to an insider [Miguel]"; "implement appropriate safeguards to ensure stockholders, like [her] are not unfairly disadvantaged"; and "establish appropriate internal controls to protect non-insider shareholders." She alleges that appellees "conspired to aid and facilitate [Miguel's] scheme to defraud" her by "conceal[ing]" the "imminent acquisition of West African assets by Vitol," which would have "significantly and materially impacted the value of the shares."

In sum and substance, Leticia's claims are that appellees failed, either intentionally or negligently, in their duties to her as "a shareholder" and deprived her of share value. Leticia's allegations are based on her status as a shareholder and concern shares that Miguel acquired from his employer under an incentive plan pursuant to the shareholder's agreements. She specifically argues that there existed a "special relationship" involving her as a shareholder because "the parties dealt with each other in such a manner for a long period of time that such [duties were] owed." For instance, she alleges in her amended petition that *"[t]he Loyas* were major shareholders in VHIISA" and, "in 2006, *the Loyas*, as well as other shareholders," exchanged *"their* VHIISA shares for shares in Tinsel."

Thus, through her claims, Leticia seeks a direct benefit from the shareholder's agreements. *See id.* at 131–32 (whether claim seeks direct benefit from contract "turns on the substance of the claim, not

artful pleading"). Further, Leticia, outside of her suit, sought and obtained substantial benefits from the contract itself when, as she alleges, Miguel "purchased her shares." *See id.* at 132. "When a non-party consistently and knowingly insists that others treat [her] as a party, [she] cannot later 'turn[ ] [her] back on the portions of the contract ... that [she] finds distasteful." *Id.* at 135 (quoting *E.I. Dupont de Nemours*, 269 F.3d at 200 n.7).

In support of their opposing positions, the parties each rely on *St. Clair v. Brooke Franchise Corp.*, No. 02–06–00216–CV, 2007 WL 1095554 (Tex. App.–Fort Worth Apr. 12, 2007, no pet.) (mem. op.). In *St. Clair*, the trial court dismissed the plaintiff's suit on the ground that she was bound to a forum-selection clause in a contract that her husband had executed to sell his insurance business to the defendant. *Id.* at *1. The contract contained a forum-selection clause, limiting jurisdiction and venue over any disputes arising under the agreement to a Kansas court, and a non-compete clause, prohibiting the husband from directly or indirectly selling insurance within a 50–mile radius. *Id.* Although the plaintiff did not sign the contract, she did execute a "Consent of Spouse," relinquishing her community interest in the business and agreeing that the "assets and her interest" were subject to the contract. *Id.* Two years later, the plaintiff began selling insurance within the contract radius. *Id.* And her husband opened a mortgage business in the same office. *Id.* After the defendant demanded that she cease selling insurance, the plaintiff sued the defendant in a Texas district court, seeking a declaration that she was not bound to the contract. *Id.* at *2. And the trial court dismissed her suit based on the forum-selection clause. *Id.*

On appeal, the plaintiff argued that she was not bound by the forum-selection clause because she was not a signatory to the contract. *Id.* The defendant argued, in part, that she was bound by the clause because she had accepted benefits from the contract in the form of an increase in the value of her community estate from the sale of the business. *Id.* The appellate court reversed the trial court's judgment, holding that the plaintiff was not bound as a signatory by the "Consent of Spouse" agreement. *Id.* at *3, 7. However, it did note that a non-signatory plaintiff can still be bound by a forum-selection clause if she (1) brings claims in a lawsuit seeking direct benefits from a contract or (2) deliberately seeks and obtains substantial benefits from the contract itself, outside of litigation. *Id.* at *4–5. The appellate court clarified that the defendant argued only the second application, and it so limited its analysis. *Id.* at *5. It explained that "any increase in the community estate ... resulting from the sale of [her husband's] business did not provide to [her] a benefit that was so direct and substantial that the doctrine of estoppel applie[d] and [bound] her to the Principal Agreement." *Id.* at *7. And, unlike in *Weekley*, the plaintiff had "never insisted, knowingly or otherwise, on being treated as a party" to the contract. *Id.* at *6. Because she "did not deliberately seek or obtain benefits from the contract," the plaintiff was not bound by the forum-selection clause. *Id.* at *6–7.

Here, Leticia did not merely receive the benefit of a passive increase to the value of the community estate; rather, she directly and personally realized a substantial benefit from selling to Miguel her portion of shares valued at $29,500,000. *Cf.id.*at *7. And, as her petition demonstrates, she has insisted on being treated as a party under the shareholder's agreements. *Cf.id.* at *6.

Notably, the plaintiff in *St. Clair* sought only to *avoid* the defendant's enforcement

of the contract against her, specifically, the non-compete provision, and she did not *seek* a benefit under the contract. Here, Leticia, through her suit, seeks a direct benefit from the shareholder's agreements. *See Weekley Homes*, 180 S.W.3d at 131.

Leticia next argues that her claims "do not fall within" the scope of the forum-selection clauses because "[n]one of [her] claims arise out of or are in connection with the [a]greement[s]," she "did not cite to the shareholder agreements at all in her Petition or in any affirmative pleadings," and her claims "were maintained without reference to the [agreements]."

As discussed, the shareholders' agreements unambiguously designate the courts of Rotterdam as the exclusive jurisdiction to resolve "*[a]ny dispute* arising out of or *in connection with*" the agreements. (Emphasis added.) Courts interpreting similar language have concluded that such clauses "encompass all claims that have some possible relationship with the agreement, including those claims that may only 'relate to' the agreement." *RSR Corp. v. Siegmund*, 309 S.W.3d 686, 701 (Tex. App.–Dallas 2010, no pet.); *see also McCafe–CCC, Ltd. v. Lunchstop, Inc.*, 107 S.W.3d 860, 866 (Tex. App.–Dallas 2003, no pet.) (construing scope of forum-selection clause). Again, Leticia's claims arise from duties that she alleges appellees owed to her as a "shareholder" to provide her with information affecting "her" Tinsel shares, a relationship that in this case could have only arisen under the shareholder's agreements. Accordingly, we conclude that the forum-selection clause is broad enough to include Leticia's claims. *See RSR Corp.*, 309 S.W.3d at 700.

Leticia next asserts that "[c]auses of action arising under securities law . . . and

common law, do not arise from contracts and do not fall within the scope of the [agreements'] forum selection clause[s]," citing *Busse v. Pacific Cattle Feeding Fund # 1, Ltd.*, 896 S.W.2d 807, 812–13 (Tex. App.–Texarkana 1995, writ denied). In *Busse*, however, the court held that the forum-selection clauses did not control the suit because the defendants were not parties to the contract and a forum-selection clause does not apply to a tort action wherein, as there, the plaintiff alleged that he was induced by misrepresentations to enter into the very contract containing the forum-selection clause at issue. *Id.* at 813.

Leticia further asserts that enforcement of the forum-selection clauses are "unreasonable" and "unjust" and constitutes "overreaching." As stated, forum-selection clauses are generally enforceable and presumptively valid, and a trial court abuses its discretion in refusing to enforce a forum-selection clause unless the party opposing enforcement meets its heavy burden to "clearly show" that (1) enforcement would be unreasonable or unjust; (2) the clause is invalid for reasons of fraud or overreaching; (3) enforcement would contravene a strong public policy of the forum where the suit was brought; or (4) the selected forum would be seriously inconvenient for trial. *Laibe Corp.*, 307 S.W.3d at 316. Here, Leticia asserts that "Texas has a significant interest in providing citizens with a forum in which to resolve civil disputes," litigating her case in Luxemborg would be "inconvenient," and she "was not given any notice of the forum-selection clause[s]."

As discussed, Texas law also allows for the enforcement of foreign forum-selection clauses. *See Weekley Homes*, 180 S.W.3d at 131. Mere inconvenience, based on Houston being "the best venue

for this case," does not allow Leticia to avoid enforcement of the forum-selection clauses. *See In re Lyon Fin. Servs. Inc.*, 257 S.W.3d 228, 233–34 (Tex. 2008) (requiring plaintiff to show "depriv[ation] of her day in court"). Further, Leticia has obtained and, by her suit continues to seek, a direct benefit from the shareholder's agreements. Her lack of awareness of the forum-selection clauses do not invalidate them. *Id.* at 233. A party "seeking to enforce a forum-selection clause is not obligated to prove that it specifically showed the clause to the opposing party as a condition of enforcement." *In re Int'l Profit Assocs., Inc.*, 286 S.W.3d 921, 924 (Tex. 2009). Leticia has not clearly shown that enforcement of the forum-selection clauses is unfair. *See Laibe Corp.*, 307 S.W.3d at 316.

Finally, Leticia argues that Metz and Maarraoui are not entitled to enforce the forum-selection clause because only "their affiliated company," Tinsel, actually signed the agreement with Miguel. She asserts that "[a]ppellees can enforce the agreements they signed against each other, but not against [her]."

Again, Leticia, in bringing her suit against Metz and Maarraoui based on their alleged actions and omissions as Tinsel directors, seeks direct benefits from the shareholder's agreement. It is undisputed, and Leticia, in her appellate brief, asserts, that Metz and Maarraoui "[were] parties to the [agreement]." As discussed above, the forum-selection clause contained in the agreement governs "[a]ny dispute arising out of or in connection with the Agreement" and "bind[s] [a] [s]hareholder's spouse," notwithstanding divorce. Thus, Leticia has not shown that Metz and Maarraoui are not entitled to enforce the forum-selection clause.

In sum, we conclude that the trial court could have reasonably concluded that equity prevents Leticia from avoiding the forum-selection clauses in the shareholder's agreements. Accordingly, we hold that the trial court did not err in granting appellees' motions to dismiss Leticia's claims.

We overrule Leticia's sole issue.

## Conclusion

We affirm the orders of the trial court.